IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JEREMY WILBORN, | ) | |
| By next friend and Conservator, | ) | |
| TARA WILBORN, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 3:13-00574 |
| | ) | Chief Judge Haynes |
| v. | ) | |
| | ) | |
| LARRY MARTIN, Interim Commissioner, | ) | |
| Tennessee Department of Finance and | ) | |
| Administration; DARIN GORDON, | ) | |
| Deputy Commissioner and Director, | ) | |
| Bureau of TennCare; and | ) | |
| PATTI KILLINGSWORTH, Assistant | ) | |
| Commissioner, Chief of Long-Term Care, | ) | |
| Bureau of TennCare, | ) | |
| | ) | |
| Defendants. | ) | |

**M E M O R A N D U M**

Plaintiff, Jeremy Wilborn, by his next friend and conservator, Tara Wilborn, filed this

action under 28 U.S.C. § 1331, the federal question statute against the Defendants: Larry Martin,

Interim Commissioner, Tennessee Department of Finance and Administration; Darin Gordon,

Deputy Commissioner and Director, TennCare Bureau and Patti Killingsworth, Assistant

Commissioner, Chief of Long-Term Care, TennCare Bureau. Plaintiff asserts claims under the

Americans with Disabilities Act ("ADA") 42 U.S.C. §§ 12131-12165 and Section 504 of the

Rehabilitation Act ("RA") 29 U.S.C. § 794(a) for the Defendants' alleged discrimination on the

basis of his disability. Plaintiff, who has quadriplegia, is an enrollee in Tennessee's TennCare, a

1

Medicaid program administered by the Defendants. Plaintiff who was a minor, receives daily home health care services, but as an adult the Defendants informed Plaintiff of a substantial reduction in these benefits. For his ADA and RHA claims, Plaintiff alleges that as a qualified person with a permanent disability, the Defendants discriminated against him by severely limiting Plaintiff's existing benefits, that will result in Plaintiff's unjustified institutionalization in a nursing home in violation of the ADA and the RA.

Before the Court is Plaintiff's motion for preliminary injunctive relief (Docket Entry No. 4) contending, in sum, that notwithstanding Plaintiff's treating physician's medical assessment that Plaintiff's medical condition requires twenty four hours of care for seven days a week, the Defendants' TennCare plan limits Plaintiff's home health benefits to a maximum of 40 hours per week of home health care that are insufficient for Plaintiff's prescribed medical care. Plaintiff cites potential additional services under the Defendants' Home and Community Based Services (HCBS) under the Defendants' CHOICES program, but the Defendants refuse to provide them. In sum, Plaintiff asserts that the Defendants' cost limitations for services in their CHOICES program will force Plaintiff's institutionalization despite Plaintiff's previous rejection by a nursing home due to his medical treatment needs.

In response, Defendants contend, in essence, that given the State's comprehensive and effective plan for home and community-based services to persons with disabilities, the TennCare benefits and other accommodations offered to Plaintiff do not violate the ADA or RA. Moreover, Defendants assert that any alternation of those benefits to provide Plaintiff his prior health care regimen will cause a fundamental alteration of its TennCare plan that is prohibited by Olmstead v. L.C., 527 U.S. 581(1999). Further, to provide Plaintiff home medical services at costs that

exceed the Defendants' individual cost cap or limitation, is not a reasonable accommodation given the State's limited resources and the needs of other individuals with disabilities for the State's CHOICES program.

For the reasons set forth below, the Court concludes that Plaintiff's proof establishes a substantial likelihood of success on his ADA and RA claims. The Court finds that Plaintiff, as a person with a serious and permanent disability, will suffer severe risk of irreparable harm if he is confined at a nursing home. Plaintiff was previously released from a nursing home due to the demands of his medical care. The TennCare program for minors had determined that Plaintiff was in need of his current home care services. Plaintiff presented a home care services plan for his continuing care that is consistent with the Defendants' CHOICES program. The preliminary injunctive relief to effect Plaintiff's medical care plan does not present a fundamental alteration of the Defendants' CHOICES program nor pose any injury to any enrollee or prospective enrollee in the CHOICES program.

## A. Findings of Fact

### 1. Plaintiff's Medical Care History

Plaintiff suffered an anoxic brain injury as a result of a suicide attempt in 2006 and enrolled in TennCare in January 2007. (Docket Entry No. 16, Dr. Willis Declaration at ¶¶ 3, 5). Plaintiff now receives twenty four hour home health care services at his residence from a private duty nurse who provides twelve hours care and a home health aide who also provides twelve hours care. (Docket Entry No. 16, Dr. Willis Declaration at ¶¶ 5, 8). Plaintiff is unable to attend to his bodily needs and is unable to communicate except that family members interpret his facial

expressions and sounds as communicating with them. (Docket Entry No. 15, Swiney Declaration at ¶ 21, and Docket Entry No. 4, Exhibit B at ¶ 2 and Exhibit C at ¶ 3). Tara Wilborn, Plaintiff's mother, who is also his conservator, testified that Plaintiff enjoys activities outside the home, such as family gatherings movies, shopping and attending Church, with the assistance of others. (Docket entry No. 4, Exhibit B at ¶ 9).

In February 2009, Plaintiff intervened as a plaintiff in Crabtree v. Goetz, No. 3:08-0939, filed in this District challenging changes to TennCare's home health benefits. Id. at Docket Entry No. 100 Third Interveners' Complaint. Based upon the ruling in that action[1], Crabtree v. Goetz,

---

[1]In Crabtree, the Court concluded that:

The Court concludes that Plaintiffs' proof establishes that as persons with disabilities, the Defendants' new benefits cuts for home health services will cause their institutionalization into nursing homes. Here, the Defendants' cuts will eliminate services that enable Plaintiffs to remain in their community placement. The Defendants previously determined that Plaintiffs' community placement was medically necessary and was the least costly method to deliver such services. Plaintiffs' proof is that the Defendants are now forcing Plaintiffs into nursing homes without any mechanisms to determine whether their medical needs can be met in the community or the nursing home. Plaintiffs' physicians and other health care providers describe the Defendants' cuts as forcing these Plaintiffs into nursing homes that would be detrimental to their care, causing, inter alia, mental depression, and for some Plaintiffs, a shorter life expectancy or death. This categorical approach is to reduce the demand side of the community services market without any efforts to adjust the supply side of the home services market (where the MCOs are generating administrative costs that represent half of the Plaintiffs' health care costs), and without individual evaluations of Plaintiffs' actual medical needs.

For these Plaintiffs, the isolating and deleterious effects described by the Supreme Court in Olmstead are present: loss of individual lives, community activities and separation from their communities and loved ones. Plaintiffs' treating physicians attest to these adverse effects if Plaintiffs' current home care services are so drastically cut. Moreover, as the Supreme Court stated: "[I]nstitutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of

No. 3:08-0939, 2008 WL 5330506, at **30-3 (M.D. Tenn. Dec. 19, 2008), TennCare continued Plaintiff's existing home health services until implementation of the Defendants' CHOICES program and completion of Plaintiff's individualized assessment thereunder. From June 19, 2008 until this action, Plaintiff received 24 hours of home medical treatment seven days a week. (Docket Entry No. 16, Dr. Willis Declaration at ¶¶ 5, 8). This care consisted of twelve hours per day for private duty nursing and twelve hours per day for home health aide care. Id. During this period, Plaintiff was under 21 years of age and his benefits were under the Defendants' plan for Early and Periodic Screening, Diagnosis, and Treatment ("EPSDT"). Id. at ¶ 6. Plaintiff who is now over 21 years of age, is ineligible for EPSDT benefits. Id.

BlueCare, one of the Defendants' managed care organizations ("MCOs") that administer services for the Defendants' CHOICES program for adult care will determine his home health care benefits. Id. at ¶¶ 3, 5. In early 2012, BlueCare initiated its assessment of Plaintiff's medical needs and evaluated Plaintiff for community-based services through Tennessee's CHOICES program. (Docket Entry No. 15, Swiney Declaration at ¶ 3). Under TennCare benefit limits and the CHOICES program, qualified enrollees are not entitled to all medical services necessary to remain in their homes. BlueCare had to develop a plan for Plaintiff's medical care consistent with CHOICES's covered benefits. (Docket Entry No. 17, Killingsworth Declaration at ¶ 48). Plaintiff's mother who is also Plaintiff's conservator rejected BlueCare's various options for her

<hr>

participating in community life." Olmstead, 527 U.S. at 600. Reduced benefits are not based on a standard of adequate medical care, but solely on fiscal considerations.

2008 WL 5330506 at * 25. The Court also noted "[a] recent report" of "a CMS study [that] ranked Tennessee's nursing homes 47th among the States. The Tennessean, December 18, 2008 at p.1." Id. at 20 n.5.

son's medical care, including for hiring of a 24-hour live-in caregiver to assist with personal care and health care tasks and attendant care with 15 hours per day at an hourly rate of $10). (Docket Entry No.15, Swiney Decl., ¶¶ 12-18, 30, 34, 37). Defendants note that Plaintiff's mother was unreceptive to providing care for her son when paid care would be unavailable due to CHOICES cost limit. Id. at ¶ 17. Plaintiff's mother also rejected skilled nursing facility ("Level 2 NF") care rating for her son's placement in a nursing home and terminated the enrollment process. Yet, in February 2013, BlueCare performed two home visits, but Plaintiff's mother again rejected BlueCare's options for community services or nursing facility reimbursement through CHOICES program. Id. at ¶¶ 6-27.

On May 3, 2013, Dr. Mathew T. Kraus and Tina Williams, a registered nurse performed a "HOME HEALTH CERTIFICATION AND PLAN OF CARE" for Plaintiff that reads, in pertinent part:

> "Orders for Discipline and Treatments (Specify Amount/Frequency/Duration)
>
>> FR Private Duty Frequency: SN 84 and CNA 84 hours per week
>> SN SN to administer medications via g-tube with 120ml H2O
>> SN to administer feedings via g-tube Flush with 120 ml H2O
>> Additional Interventions to include: SN to apply glasses PRN Q shift
>> Additional Intervention to include: SN to apply eye patch to affected eye PRN for squinting of eyes or dilated pupil
>> Additional Interventions to include: SN to cleanse nares PRN with BBG; to keep nasal airway passage clear

(Docket Entry No. 26-4 at 1). Plaintiff was rated as having functional limitations in six of the nine functional categories. Id.

Dr. Kraus, an internist and pediatrician who has been Plaintiff's primary care physician since Plaintiff was 5 years old, filed his declaration in this action that reiterates his earlier

findings, but adds that "[w]ithout the level of home health care he receives now [168 hours], it is my opinion, based on a reasonable medical certainty, that Jerry will be at great risk of further complications requiring hospitalization at greater expense than the home health care". (Docket Entry No. 4, Exhibit C at ¶ 6). Dr. Kraus also stated that with the Defendants' proposed care of 40 hours of home health services, Plaintiff will be forced to be placed in a nursing home. Id. at ¶¶ 5-7. Kraus is unaware of any medical study that a nursing home is an appropriate medical placement for a person with Plaintiff's condition. Id. In Dr. Kraus's opinion, Plaintiff needs a higher level of care than provided in a nursing home and additional staff would be necessary. Id. Dr. Kraus also stated that it is not safe for Mr. Wilborn to be left by himself because of his constant need for "secretion/pulmonary" care. Id.

Dr. Robert Chironna who specializes in rehabilitation medicine at the Patricia Neal Rehabilitation Center in Knoxville agrees with Dr. Kraus that Plaintiff cannot be alone because of his constant need for suctioning. (Docket No. 4, Exhibit D. At ¶ 3). In Dr. Chironna's opinion, Plaintiff 's condition is "complex enough that he requires frequent suctioning ... needs frequent position changes and multiple tube treatments and feedings Id. Given his condition, Dr. Chironna notes that Plaintiff id "unable to use his hands and cannot push a button" Id. at ¶ 4. Dr. Chironna shares Dr. Kraus's opinion that the Defendants' proposed offer of home services would require Plaintiff's placement in a nursing home and such placement creates a greater risks of hospitalization that would exceed the cost of his current home care regimen. Id. at ¶¶ 6-8. In a second affidavit, Dr. Chironna opines that Plaintiff's need for constant suctioning cannot be provided by the typical nursing facility and recommends a tracheotomy unless Plaintiff can receive constant suctioning. (Docket Entry No. 26-10 at 2-3).

Rena Yeary, a licensed practical nurse who has been one of Plaintiff's providers and prior to that worked in skill nursing facilities, submitted her affidavit on Plaintiff's medical needs and the likely effects of a nursing home placement. (Docket Entry No. 26-11 at ¶¶ 1-3). Yeary describes Plaintiff as a "silent aspirator" who does not evince any warnings or signs of his need to aspirate. Id. at ¶ 2. Because Plaintiff cannot be heard from another room, "he requires constant monitoring". Id. In Yeary's experience, a nurse in a long term care facility has 20 to 30 patients in addition to rounds and could not provide the requisite care for Plaintiff. Id. at ¶ 3.

Plaintiff notes that the Center for Medicaid and Medicare Services (CMS) collects data concerning nursing facility staffing and makes ratings available online at http://www.medicare.gov/NursingHomeCompare. Among six nursing facilities within 25 miles of Plaintiff's home in Morristown, the highest ranked facility for staffing averaged less than 5 staff hours (including RNs, LPNs, CNAs and PTs) per resident per day; the lowest averaged about 3.5 staff hours per resident per day. (Docket Entry No. 26-9 at ¶ 4). In Crabtree, the Court noted "[a] recent report" of "a CMS study [that] ranked Tennessee's nursing homes 47th among the States. The Tennessean, December 18, 2008 at p.1." 2008 WL 5330506 at * 20 n.5.

Dr. Andrea Willis, BlueCare's director for its CHOICES program, responds that BlueCare had never determined that Plaintiff needed 24/7 care that is not provided in any medical care setting. (Docket Entry No. 16 at ¶¶ 2-3). Dr. Willis stated that the care sought for Plaintiff "is simply not provided elsewhere – not in adult patient homes, nursing facilities, or routinely in hospital inpatient settings. Certainly, patients receive periodic episodes of hands-on, one-on-one care as needed. However, a nurse or aide is not assigned to a patient's bedside every hour of every day. Such care is prohibitively expensive and is more than is required". Id. at ¶ 23.

As to Plaintiff's need for additional nurses for his nursing home placement, Dr. Wiillis stated that those issues could be addressed during the admission process, and the nursing facility would provide the staffing and plan necessary to provide appropriate care for Plaintiff, but the reimbursement rate to the hospital for Plaintiff's care would remain the same. Id. at ¶ 21. The Defendants do not explain the economic viability of the nursing home agreeing to provide additional nurses without additional compensation or reimbursement.

By notice dated February 20, 2013, Blue Care informed Plaintiff that as of March 2, 2013, Plaintiff would receive only 40 hours of home health services and or placement in a nursing facility. (Docket No. 4, Exhibit A). BlueCare also notified Plaintiff that his current services of private duty nurse and home health aide would also end effective March 2, 2013. (Docket Entry No.16, Dr. Willis Declaration, Exhibit B thereto and Docket Entry No. 15, Swiney Declaration at ¶ 28). At some point, BlueCare offered Plaintiff 30 hours per week of home nursing services and 10 hours per week for a home health aide, the maximum benefits for adults with similar circumstances as Plaintiff. Id. Defendants also informed Plaintiff that he was eligible for 101.5 hours of care per week through the CHOICES program, but this limit created a 66.5 hour gap each week that Plaintiff's mother is unable to cover. Defendants contend those offered services actually exceed the applicable benefit limits for adults. Id. Tenn. Comp. R. & Regs. 1200-13-13-.01 (56).

Plaintiff appealed BlueCare's service reduction plan. (Docket Entry No. 15, Swiney Declaration, at ¶¶ 28-37). An Administrative Law Judge ("ALJ") determined Blue Care correctly terminated Plaintiff's daily twenty four hour services benefits, but also found that "**Petitioner cannot be left alone primarily due to his inability to swallow properly. Petitioner frequently**

chokes on hs saliva which must be cleared from his throat using a suction device" (Docket

Entry No. 26-8 at 2) (emphasis added). The ALJ also found that "**Petitioner [Plaintiff]**

"**requires 24 hours per day, 7 days per week of either PDN or HHA care to meet his**

**medical needs.**" Id. (emphasis added).

## 2. Defendants' CHOICES Program[2]

Tennessee's Long Term Care Community Choices Act authorizes the creation of a

"long-term care system" that "shall promote independence, choice, dignity, and quality of life ...

and shall include consumer-directed options that offer more choices regarding the kinds of

long-term care services people need [and] shall offer services ... delaying or preventing the need

for more expensive, institutional care." Long Term Care Community Choices Act of 2008, Pub.

Ch. No. 1180, Senate Bill No. 4181, an Act to amend Tenn. Code Ann., Title 63, 68 and 71.

This legislative goal promotes the purposes of the ADA and RHA.

A part of the State's "long term care system" is the Defendants' TennCare program that is

authorized and funded by the United States in a ratio of $3 in federal funds to every $1 of state

funds. Defendants note that Federal regulations on State waivers for home and community based

medical care services require cost neutrality between the cost of community care and the

institutional care, such as a nursing facility. Defendants assert that the Center for Medicare and

Medicaid Services ("CMS") will not approve such a waiver request unless the State Medicaid

---

[2]The Court incorporates by reference its earlier outline of the history of the Defendants'
TennCare benefits for home health care in Crabtree, that described Tennessee's statutory scheme
for long-term home health care services. 2008 WL 5330506, at **16-23. Since the ruling in
Crabtree, the Defendants adopted plans for long-term health care under its state laws and secured
a Medicaid waiver.

agency provides specific assurances of cost neutrality of the waiver program. (Docket Entry No. 17, Killingsworth Declaration, at ¶ 18, n. 3, citing 42 C.F.R. § 441.302). According to Defendants, this cost neutrality mandate requires the State to ensure that the per capita cost of providing home and community based services and all other Medicaid services to enrollees in the HCBS Waiver program does not exceed the per capita cost of providing institutional care plus the cost of providing all other Medicaid services to institutionalized residents that are not included in the payment for the institutional care. Defendants cite 42 C.F.R. § 44.301(a)(3) as providing that a State's waiver application must specify whether cost neutrality will be determined on an aggregate basis (by combining the costs of waiver and other Medicaid services for all individuals enrolled in the waiver and comparing the average per capita cost to the average cost of institutional and other Medicaid services), or on an individual basis (by comparing such costs on an individual basis).

For its home and community based waiver, Tennessee has elected to calculate budget neutrality on an individual basis. (Docket No. 17, Killingsworth Declaration at ¶ 18, n. 3). Thus, the Defendants' CHOICES program imposes an individual cost neutrality cap, namely that the cost of services provided to an individual in the home and community cannot exceed the cost of care in a nursing facility for an individual. Id. at ¶ 18. Defendants cite this cost limitation as consistent with the State's statutory purpose and public policy to structure the program to maximize the number of enrollees. Id. at ¶¶ 37, 43.

As pertinent here, Tennessee's "CHOICES" program offers limited medical care, personal assistance care, and personal care service for community or home care with certain exceptions. Under CHOICES, the limit for home health care services is the cost of nursing

facility care- $55,000 per year for level 1 care nursing facility and $59,000 per year for level 2 care nursing facility. (Docket No. 17, ¶ 29). The exceptions are persons with tracheotomies who require "deep suctioning," for which the limit is $144,000 per year and a person who is ventilator dependent, the limit is $216,000 per year. (Docket No. 26 at 14).

CHOICES also has a "Consumer Direction" option that allows the enrollee to hire personnel to provide home and community-based services consistent with the cost limitations for the CHOICES program. Id. at ¶¶ 47- 48. [3] Persons who are unable to direct their own services are permitted to designate a Representative for Consumer Direction to employ workers and direct services on their behalf. Id. at ¶ 48. More than 1,000 CHOICES enrollees elected this Consumer Direction option. Id. CHOICES enrollees can select workers delivering services through Consumer Direction that a licensed or registered nurse provided at the direction of the enrollee or his authorized representative at less cost. Id.

To be accepted into CHOICES, an enrollee must accept the individual cost neutrality cap that, in effect, limits the available services to meet enrollee's health needs. If an individual needs services in excess of the "individual cost cap," Defendants' CHOICES's program and policy "allow" TennCare enrollees to "choose" medical care in an institution or go without long term services and supports. Plaintiff notes that these "individual cost caps" in the aggregate do not

---

[3] The services subject to Consumer Direction are personal care, attendant care, in-home respite care, and a community-based residential alternative to institutional care that is available only through Consumer Direction, called Companion Care. The Companion Care option affords the availability of a 24-hour live-in caregiver for persons who need assistance with activities of daily living at intervals throughout the day and night, but do not have family members or other natural supports to provide that assistance. Currently, there are 201 individuals receiving Consumer Directed Companion Care in CHOICES. (Docket Entry No. 17 Killingsworth Declaration at ¶ 47).

exceed expenditure projections for the CHOICES program given its current operation for which there is not a waiting list.

Aside from the CHOICES cost limitation and stated exceptions, TennCare's MCOs are permitted to provide an accommodation or a cost-effective alternative to institutional care, in excess of those limits, provided the total cost of home health and private duty nursing does not exceed the applicable level of nursing facility reimbursement the individual would otherwise qualify to receive. (Docket Entry No. 17, Killingsworth Declaration at ¶¶ 43-44).Yet, the central determinant in CHOICES is the individual cost neutrality cap, a requirement that the cost of services provided to an enrollee in the home and community cannot exceed the cost of care in an institution at a Level 1 or Level 2 nursing home reimbursement only. Id. at ¶ 18. A CHOICES enrollee can receive home care services that cost more than the average cost of Level 1 nursing home reimbursement. Id.

CHOICES's implementation commenced on March 1, 2010, with an enrollment target of 7,500 that was increased to 9,500 in September 2011, and ultimately to 12,500 on July 1, 2012, but there is not a waiting list.[4] Id. at ¶ 40. As of June 1, 2013, 12,417 individuals receive CHOICES HCBS as an alternative to nursing facility placement. Id. at ¶ 41. Over 500 individuals were transferred from nursing facilities to enrollment in CHOICES HCBS during the first year of the program's operation, and total nursing facility-to-community transitions in

_____

[4] According to the Defendants, these enrollment targets represent the enrollment limit on CHOICES Group 2, enrollees who meet the medical eligibility requirements for nursing facility care, but who have elected to receive home or community care. Through December 31, 2013, there is no enrollment target on CHOICES Group 3 for enrollees who do not meet nursing facility level of care criteria, but are determined to be "at risk" of nursing facility placement unless home and community based services are available.(Docket Entry No. 17 Killingsworth Declaration at ¶ 40 n. 6).

CHOICES during the first two full program years exceeded 1,300. Id. at ¶¶ 50-56. TennCare MCOs are subject to specific contractual requirements relating to nursing facility diversion and transition. Id. at ¶¶ 52 -55. In July 2012, the State raised the nursing facility level of care ("LOC" or medical eligibility) standard to target the nursing facility benefit to persons with higher acuity of need, but retained home and community based services to prevent or delay the need for nursing facility placement. Id. at ¶ 5. Within eight months after initiating the new LOC standards, the State has diverted almost 18% of all new nursing facility applicants (total numbers not provided) to more integrated community-based settings. Id. at ¶¶ 57-60.

As of June 30, 2012, 12,862 persons receiving HCBS under CHOICES had an average cost of $12,262 per person – over 50% less than the "individual cost cap" of $55,000 per person who qualifies for nursing facility care at level 1 and 39% less than the average per person nursing facility expenditure during FY 2012[5]. (Docket Entry No. 17-2, Exhibit B to Killingsworth Declaration). From February 2010 to June 30, 2012, the average per person HCBS expenditure decreased by $3,784 per person while the number of persons receiving HCBS increased by 6626 over the same period. Id. During that same period, the number of persons receiving nursing home care decreased by 4%, but the average cost per person for nursing home care caused expenditure to increase by 4%. Id. According to TennCare Director Darin Gordon, as of the end of FY 2012,

---

[5] Plaintiff contends that "[t]hese figures reveal two facts. The State's HCBS program is designed to capture "low-hanging fruit" – to cover individuals with the lowest cost of HCBS – at the expense of individuals with more complicated care requirements like Jeremy Wilborn. Increasing services for Mr. Wilborn to enable him to remain in his home and community will have no significant impact on the financial trends for HCBS but his placement in a level II or higher level NF will certainly continue the upward per member expenditures for nursing facility services." (Docket Entry No. 26, Plaintiff's Reply at 11-12).

the "[a]nnualized per member **expenditures for nursing facility services have increased by 6% from $42,300 in FY 2010** . . . , while annualized per member HCBS expenditures have declined by 26% (from $21,100).(Docket Entry No. 26-7 at 1, Letter dated February 3, 2013 from Gordon to Sen. Ramsey and Rep. Harwell).

In 2012, more than 90% of TennCare's expenditures for long term care are for nursing home care. Id. Of the State's expenditures for long term medical care in 2012, nursing homes received $951,177,000 and home and community care received $157,682,800. Id. For 2013, the projected expenditures are $964,847,900 for nursing homes and for the home and community care $180,567,900. Id. Nursing home costs rose by 6% in fiscal year 2012, but home health care costs declined by 26% Id. at 2.

Defendants estimate that the cost of 24/7 private duty nurse services to a single enrollee exceeds $324,000 and if required, would limit CHOICES enrollment to no more than 20 individuals. (Docket Entry No. 17, Killingsworth Declaration at ¶ 13) Defendants estimate the annual cost of Plaintiff's current home services at $238,320 that would limit CHOICES HCBS to just over 15 individuals. Id. As discussed infra, the relevant analysis is the cost of providing care to comparable individuals. On its face, the Defendants' costs projections analysis fail to limit their analysis to the enrollees with medical needs comparable to Plaintiff's needs.

## B. Conclusions of Law

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) is "commonly-known as the civil rights bill of the disabled," Americans Disabled for Accessible Public Transportation (ADAPT) v. Skinner, 881 F.2d 1184, 1187 (3rd Cir. 1989) (en banc). The RA prohibits disability-based discrimination by federally funded recipients:

No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...

29 U.S.C. § 794(a).

Extending the prohibitions of Section 504, Congress enacted the Americans with Disabilities Act (ADA) in 1990, to prohibit discrimination by all public entities, regardless of whether they receive federal funding. 42 U.S.C. §§ 12131-12165; H.R. Rep. No. 101-485, pt. 3, at 49 (1990), reprinted in 1990 U.S.C.C.A.N. 267, 472. The goals of the ADA "are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for each individual [with disabilities]." 42 U.S.C. § 12101(a)(7). The ADA and Section 504 are analyzed together because there is no significant difference in the analysis of rights and obligations created by the two. Radaszewski v. Maram, 383 F.3d 599, 607 (7th Cir. 2004); Fisher v. Oklahoma Health Care Authority, 335 F.3d 1175, 1179 n.3 (10th Cir. 2003).

In enacting the ADA, Congress made certain findings: "(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem; (3) discrimination against individuals with disabilities persists in such critical areas as ... institutionalization ... (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, ... failure to make modifications to existing facilities and practices, ... [and] segregation ... " 42 U.S C §§ 12101(a)(2), (3), (5). In the ADA, Congress declared that "segregation" of persons with disabilities is a "for[m] of discrimination," and that such discrimination persists in the area of

"institutionalization" 42 U S..C  §§ 1210l(a)(2), (3), (5).

The ADA expressly applies to "any State or local government". 42 U. S. C §§ 12131(1)(A), (B). The ADA prohibits denial of "the benefits of the services, programs, or activities of a public entity, or [to] be subjected to discrimination by any such entity.." 42 U. S.C. § 12132. A regulation implementing the ADA specifically requires public entities to make reasonable modifications in "policies, practices, or procedures" when the modifications are necessary to avoid discrimination, unless the accommodation would fundamentally alter the nature of the program. 28 C. F. R. § 35.130(b)(7). Section 504 of the RA also requires publicly-funded programs to provide reasonable accommodations when needed to assure that persons with disabilities have meaningful access to such programs and services. 29 U.S.C. § 794(a); see also Southeastern Community College v. Davis, 442 U.S. 397, 410 (1979).

Under the ADA, a "qualified individual with a disability" is a person who "with or without reasonable modifications to rules, policies or practices" meets the "essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Section 504's definition is substantially similar. See 29 U.S.C. § 705(2)(B). ADA regulations define disabilities, with respect to an individual, to include "a physical or mental impairment that substantially limits one or more of the major life activities of such individual ... such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. §§ 35.104. The Section 504 requirements are essentially the same. 28 C.F.R. § 41.31. The Court concludes that Plaintiff's quadriplegia renders him a qualified person with a disability within the meaning of the ADA and the RA.

The concept of "discrimination" under Section 504 and the ADA encompasses more than disparate treatment of people with disabilities as compared to non-disabled individuals. Olmstead v. L.C., 527 U.S. 581, 598 (1999) (ADA); Alexander v. Choate, 469 U.S. 287, 300-01, (1984) (Section 504). In addition to Congress's finding that segregation of persons with disabilities, especially in institutions, is a form of discrimination, 42 U.S.C. § 12101(a)(2), (3), (5), the Supreme Court has also held that unjustified isolation is properly regarded as discrimination based on disability under the ADA. Olmstead, 527 U.S. at 597. Such institutionalization of individuals with disabilities who can live in the community "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." Id. at 600. Moreover, institutional confinement "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." Id. at 601. Thus, a State is obligated to provide community-based treatment for disabled persons if; (1) the state's treatment professionals find that community-based treatment is appropriate; (2) the affected individuals do not oppose community-based treatment; and (3) placement in the community can be reasonably accommodated, taking into account the state's resources and the needs of others with similar disabilities. See Olmstead, 527 U.S. at 607; Radaszewski, 383 F.3d at 608 ("In view of the integration mandate, the [Olmstead] Court agreed ... that a State is obliged to provide community-based treatment for individuals with disabilities ...."). Section 504's ban on disability discrimination also encompasses unjustified institutionalization. See, e.g., Frederick L. v. Dep't of Public Welfare, 157 F. Supp. 2d 509, 538 (E.D.Pa. 2001). To be sure, in Olmstead, the Supreme Court noted that "[w]e do not in this opinion hold . . . that the ADA

18

requires States to 'provide a certain level of benefits to individuals with disabilities' . . . .." 527 U.S. at 603 n.14.

The ADA designated the Attorney General to promulgate regulations to enforce the ADA. Among those regulations is the "integration mandate regulation," that provides: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.." 28 C. F. R. § 35.130(d) (1998). The preamble to these regulations defines "the most integrated setting appropriate to the needs of qualified individuals with disabilities" as, "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible " 28 C. F. R. § 35, App A, at. 450 (1998). Under RA regulations, agencies receiving federal financial assistance must administer their programs and activities "in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C. F. R. §41.51(d) Moreover, the ADA regulations provide that:

> A public entity shall make reasonable modifications in policies, practices, 01 procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.."

28 C. F. R. § 35.130(b)(7) (1998). The ADA's implementing regulations also prohibit arrangements that have a discriminatory effect. Under this ADA regulation, a public entity may not:

> directly or through contractual or other arrangements, utilize methods of administration (I) [t]hat have the effect of subjecting qualified individuals with a disability to discrimination on the basis of disability; [and] (ii) [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with

disability.

28 C.F.R. § 35.130(b)(3). Section 504 regulations contain similar requirements. <u>See</u> 28 C.F.R. § 41.51(b)(3)(I); 45 C.F.R. § 84.4(b)(4). These regulations, known as the "integration mandate," are construed and applied in the same manner. <u>Fisher</u>, 335 F.3d at 1179 n. 3.

The United States Supreme Court analyzed and interpreted the integration mandate in <u>Olmstead</u>, involving individuals with mental disabilities who were confined in Georgia's state psychiatric institutions, but who wanted to live in the community. 527 U.S. at 587. The <u>Olmstead</u> plaintiffs asserted that the state's refusal to pay for services that would enable them to live in community settings violated the integration mandate of Title II of the ADA and its implementing regulations. <u>Id.</u> The Supreme Court agreed, and held that "unjustified isolation ... is properly regarded as discrimination based on disability." <u>Id.</u> at 597. The Supreme Court did not agree on the precise standard to determine when institutionalization is unjustified. A plurality in <u>Olmstead</u>, articulated a standard that lower courts have since applied: states should be required to place persons with disabilities in community settings rather than in institutions when the state's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the state and the needs of others with disabilities. <u>Id.</u> at 587. The plurality, however, stated that an accommodation is unnecessary, if the state can demonstrate that the modifications would fundamentally alter the nature of the services, program, or activity. <u>Id.</u>, citing 28 C.F.R. § 35.130(b)(7).

As these principles are applied here, albeit under the aegis of another TennCare program, the Defendants previously determined that Plaintiff needed these medical services provided at his home. Plaintiff's prior placement in a nursing home resulted in the nursing home's decision to release Plaintiff due to the demands of his medical care. Plaintiff's treating physician recently determined that Plaintiff needs his medical services in his home. Such facts have been deemed sufficient for injunctive relief See, e.g., Radaszewski, 383 F.3d at 608 (holding that there was "little doubt" that the plaintiff could be cared for at home because he had been receiving care at home for more than 10 years). With the Defendants' cost limits for home care, Plaintiff would be forced to move to a nursing facility. Based upon these facts, the Court concludes that the Defendants have not provided Plaintiff, a qualified person with a disability, with a reasonable accommodation with its CHOICES cost limits that would in effect, cause the institutionalization of the Plaintiff, contrary to the ADA and RA.

The Defendants argue that Plaintiff's motion seeks an unreasonable accommodation because the Defendants have offered benefits for home care that are equal to the nursing home care level to which Plaintiff was rated. Based on these cost factors, Defendants argue that Plaintiff's requested accommodation exceeds the relief awarded under the integration mandate, citing Olmstead, 527 U.S. at 604 (recognizing the lower court determination that the community placements requested by the plaintiffs cost less than institutional care); Fisher v. Okla. Health Care Auth., 335 F.3d 1175, 1183 (noting that the cost of institutional care for the plaintiffs would be "approximately twice as high as community-based care"); Radaszewski ex rel. Radaszewski v. Maram, No. 01-C9551, 2008 WL 2097382, at *15 (N.D. Ill. 2008) (finding that the "unrebutted evidence clearly shows that the cost of caring for [plaintiff] in the proper institutional setting . . .

would be substantially greater than the cost of allowing [him] to remain in the community") and Crabtree, 2008 WL 5330506, at **2, 22 (**"that the costs of nursing home care exceed the costs of their necessary home health services**, and that under state law, the cost of the nursing home care can be made available to them to pay for such services in their home...Of particular significance [the CHOICES program] authorizes the Plaintiffs to receive TennCare funding to effect their own home health care plan, including the hiring of a family member or friend at their residence or in a community setting."). In sum, the Defendants argue that the State has offered Plaintiff the relief that he requested in Crabtree.

As to these contentions, at the time of Crabtree, the Defendants' current plan for community services was not sufficiently defined under the Olmstead analysis. The Court observes that at the time of the Crabtree decision, the Defendants had not provided any individual health assessments for adults nor implemented the State statute's CHOICES program for adult home health services. The alternative costs in Crabtree were identified by the plaintiffs as sufficient for their home medical service needs. Here, based upon the 2013 individualized assessment of Plaintiff's medical needs, Plaintiff's treating physician prescribed the home care regimen of twenty four hours/seven days a week care with a combination of nurse and home health aide. At the hearing, Plaintiff identified a self directed plan for his care at a cost of $108,137 (Docket Entry No. 37) that is much less than the Defendants' assertions of those costs and consistent with the Defendants' cost cap for similarly situated CHOICE enrollees.

Contrary to the Defendants' assertions, the Court is not taking Plaintiff's cost contention "to its logical extremes" so as to "require state Medicaid programs to reproduce every care environment found in the overall health continuum within an enrollee's home, if the enrollee

22

preferred that community setting, regardless of cost." (Docket Entry No. 13, Defendants'
Memorandum at 26). The Defendants' chosen measure of costs based upon nursing home care
may be presumptively adequate, given CMS's approval. Yet, the ADA and the RA stand
independent of the Medicaid statute and simply require consideration of an individual enrollee's
medical needs and the impact of providing such needs for similarly situated enrollees. As the
Attorney General's Statement on <u>Olmstead</u> and the ADA observes: "A state's obligation under
the ADA are independent from the requirement of the Medicaid program...the Medicaid Act does
not exempt the state from serving additional people in the community to comply with the ADA
or other laws, for example by seeking a modification of the waiver to remove the cap". (Docket
Entry No. 26-5 at 5). Here, the relief ordered by the Court is within the cost parameters of the
Defendants' cost limitation for similarly situated TennCare enrollees.

For an award of preliminary injunctive relief, the Court must consider four factors: (1)
likelihood of Plaintiffs' success on the merits; (2) any irreparable harm to the Plaintiffs; (3) any
adverse effect on other parties or persons; and (4) the public interest. <u>Gonzales v. National Bd.
of Med. Exam'rs</u>, 225 F.3d 620, 632 (6th Cir.2000). Based upon the Court's findings, the
Defendants' failure to provide services "in the most integrated setting appropriate," or placing a
qualified individual at "high risk for premature entry into a nursing home," satisfies the standard
for granting injunctive relief under the ADA and RHA. <u>See</u> <u>Fisher v. Oklahoma Health Care
Authority</u>, 335 F.3d 1175, 1184-1185 (10th Cir. 2003).

The loss of necessary Medicaid services constitutes irreparable harm. <u>See</u> <u>Daniels v.
Wadley</u>, 926 F. Supp. 1305, 1313 (M.D. Tenn. 1996) <u>vacated</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u> <u>grounds</u> <u>sub</u> <u>nom</u>
<u>Daniels v. Menke</u>, 145 F.3d 1330 (6th Cir. 1998); <u>Markva v. Haveman</u>, 168  F. Supp. 2d 695,

719 (E.D. Mich. 2001) (recognizing that there is no adequate remedy at law for denial of medical care and recognizing "the principle that denial or delay in benefits which effectively prevents plaintiffs from obtaining needed medical care constitutes irreparable harm. In other words, risk of further injury to health warrants injunctive relief."). See also, e.g., Maine Ass'n of Interdependent Neighborhoods v. Petit, 647 F. Supp. 1312, 1315 (D. Me. 1985) (holding that forcing plaintiff to leave her family and enter a nursing home would irreparably injure her physical and mental health); Kai v. Ross, 336 F.3d 650, 656 (8th Cir. 2003); Beltran v. Meyers, 677 F.2d 1317, 1322 (9th Cir. 1982) (holding that irreparable injury shown when enforcement of a Medicaid rule "may deny [plaintiffs] needed medical care); Caldwell v. Blum, 621 F.2d 491, 498 (2d Cir. 1980) (holding that Medicaid applicants established harm where they would "absent relief, be exposed to the hardship of being denied essential medical benefits"); McMillan v. McCrimon, 807 F. Supp. 475, 479 (C.D. Ill. 1992) (holding that "[t]he nature of their claim - a claim against the state for medical services- makes it impossible to say that any remedy at law could compensate them").

The public interest is served by the enforcement of the ADA and the RHA, as found by other courts. See, Fisher, 335 F.3d at 1180; Heather K. v. Mallard, 887 F. Supp. 1249, 1260 (N. D. Iowa 1995).

The Court concludes that Plaintiff, as a person with a serious and permanent disability, will suffer severe harm, if he is confined at a nursing home instead of receiving medical services in his home. Plaintiff lacks the financial resources to pay for his in-home health care out of pocket. Plaintiff's mother is unable to cover the gap in coverage created by the Defendants' cost limitations. Given the medical complexity of Plaintiff's condition, Plaintiff is unable to receive

adequate care in a nursing home because the nursing home is likely unable to assume the individual health care attention Plaintiff requires. In addition to Plaintiffs' physicians, the ALJ found that Plaintiff needed 24/7 medical care. Nurse Yeary provides insightful information about the 20-30 patient assignment for a nurse in a skilled nursing facility. Killingsworth's affidavit admits that the level of care earlier provided to and sought by Plaintiff is cost prohibitive and is unavailable in any medical care setting. Although Defendants refer to the prospect of discussions with the nursing home about additional staff for Plaintiff, the Defendants also state that the nursing home's reimbursement rate would remain the same. The Court is unclear if this stated option is realistic from the perspective of a nursing home. Absent such care, Plaintiff's physicians opine that placement of Plaintiff in a nursing home would pose serious risk to Plaintiff's health and creates serious risk of more expensive hospitalization without proper care. As the Court noted in <u>Crabtree</u>, CMS rated Tennessee's nursing care 47th out of all 50 States. Defendants' cost limitations will force Plaintiff into a nursing facility that is not a reasonable accommodation and would endanger Plaintiff's life, for which any monetary award is inadequate. <u>See</u> <u>McCrimon</u>, 807 F. Supp. at 479.

As to the harm to others, the limited relief sought by the Plaintiff, approximately $108,137 in consumer directed care that is consistent with the CHOICES provisions for similarly situated enrollees, namely the enrollees with tracheotomies or who are ventilator dependent, where the high end of range of permissible cots is $216,000. These costs ranges are not shown to harm others as the Defendants do not dispute that their expenditures in the CHOICES program have not exceeded this program's budget. Finally, the Defendant cannot be harmed by complying with what the Federal law requires. As stated by the Seventh Circuit:

> Because the defendants are required to comply with the [law in question], we do not see how enforcing compliance imposes any burden on them. The Act itself imposes the burden; this injunction merely seeks to prevent the defendants from shirking their responsibilities under it.

Haskins v. Stanton, 794 F.2d 1273, 1277 (7th Cir. 1986) (granting injunction requiring defendant's compliance with Federal Food Stamp law.)

For the reasons stated above, the Court concludes that Plaintiff has demonstrated a strong likelihood of success on the merits of his ADA and RA claims that the Defendants' limits on his home health care services will force his institutionalization in a nursing home in violation of those Acts. The Defendants' prior approval of Plaintiff's home health care services and his treating physicians' assessment that Plaintiff continues to need such care are proof that institutionalization will cause injury to Plaintiff's mental and physical health demonstrating irreparable injury. For these reasons, the Court concludes that the Plaintiffs' motion for a preliminary injunction should be granted, but only if Defendants' fundamental alteration defense under ADA regulation for state programs lacks merit.

## B. Defendants' Fundamental Alteration Defense

Defendants assert the fundamental alteration defense under the ADA regulation, 28 C.F.R. § 35.130(b)(7) as a bar to the relief sought by Plaintiff. In Olmstead, the Supreme Court described this defense:

> Sensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities.

527 U.S. at 604.

Here, this controversy involves a single Plaintiff whose costs for his home care services represent only a fraction of the Defendants' total funds in its CHOICES program. Yet, for this defense, the Court must compare the impact of such relief to the cost of such relief to other similarly situated enrollees: "If the expense entailed in placing one or two people in a community-based treatment program is properly measured for reasonableness against the State's entire mental health budget, it is unlikely that a State, relying on the fundamental-alteration defense, could ever prevail. Id. at 603. Thus, where:

> the District Court compared the cost of caring for the plaintiffs in a community-based setting with the cost of caring for them in an institution ... a comparison so simple overlooks costs the State cannot avoid; most notably, a "State ... may experience increased overall expenses by funding community placements without being able to take advantage of the savings associated with the closure of institutions."

Id. at 604.

On the other hand, as stated by the Tenth Circuit in Fisher: "[i]f every alteration in a program or service that required the outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would be hollow indeed." 335 F.3d at 1183. The Third Circuit held that "states cannot sustain a fundamental-alteration defense based solely upon the conclusory invocation of vaguely-defined fiscal constraints." Frederick L., 364 F.3d at 496 (citing Makin, 114 F. Supp.2d at 1034). In Makin, Hawaii invoked the fundamental-alteration defense, contending that increasing community placements would violate state and federal funding limits and change its existing programs with "unlimited" state funding for community mental health services. 114 F. Supp.2d at 1034. The district court rejected that defense, reasoning that a potential funding problem, without more, would not establish the fundamental-alteration defense. Id.

As the Third Circuit explained in Frederick L., " Olmstead lists several factors that are relevant to the fundamental-alteration defense, including but not limited to the [1] State's ability to continue meeting the needs of other institutionalized mental health patients for whom community placement is not appropriate, [2] whether the State has a waiting list for community placements, and [3] whether the state has developed a comprehensive plan to move eligible patients into community care settings." 364 F.3d at 495 (citing Olmstead, 527 U.S. at 605-06). The cost comparison for this defense is the costs to provide the relief to substantially similar enrollees receiving home health care. In Radaszewski, where the plaintiff was a minor who required 24/7 coverage at a cost of $15,000 to $20,000 month for home medical care, the Seventh Circuit defined the appropriate cost comparison:

> **A court must therefore take care to consider the cost of a plaintiff's care not in isolation, but in the context of the care it must provide to all individuals with disabilities comparable to those of the plaintiff ... with similar needs ...** If the State would have to pay a private facility to care for Eric, for example, and the cost of that placement equaled or exceeded the cost of caring for him at home, then it would be difficult to see how requiring the State to pay for at-home care would amount to an unreasonable, fundamental alteration of its programs and services.

383 F.3d at 614 (emphasis added).

As to the first Olmstead factor, given Plaintiff's serious issues with his constant inability to swallow, the similar enrollees for costs comparison are CHOICES enrollees who are ventilation dependent or enrollees with tracheotomies whose cost caps or limitations are $144,000 to $214,000, respectively. Plaintiff identified the ability to meet his needs for home medical care at $108,137 (Docket Entry No. 37) that falls well under the Defendants' cost limit for similarly situated CHOICE enrollees. The Defendants have not shown that the expenditures

of home health services for similarly situated TennCare enrollees would force the placement of similarly disabled enrollees in nursing homes. Again, Defendants did not dispute that the funding for their CHOICES program is well within its budget, and that CHOICES does not have a waiting list.

As to the second factor, Plaintiff's proof is that within the structure of CHOICES, such services can be provided in combination with other TennCare services. Defendants allow Blue Care to make cost modification for a CHOICE enrollee consistent with cost caps; that is what Plaintiff has done in this action

The third factor under <u>Olmstead</u> is "whether the State has developed a comprehensive plan to move eligible patients into community care settings," <u>Frederick L.</u>, 364 F.3d at 495 (citing Olmstead, 527 U.S. at 605-06). The <u>Olmstead</u> plurality provided a specific example of the limited reach of this integration mandate:

> If, for example, the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with .... disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met.

<u>Id.</u> at 498 (quoting 527 U.S. at 584) (emphasis added).

For this integration factor, a state must show that the plan "demonstrates a reasonably specific and measurable commitment to deinstitutionalization for which [it] may be held accountable." <u>Frederick L.</u>, 422 F.3d at 157. As examples of a comprehensive working plan, in <u>Sanchez v. Johnson</u>, 416 F.3d 1051 (9th Cir. 2005), the Ninth Circuit found an effectively working plan where: (1) a 30 year old state law required coverage of services for people with developmental disabilities to prevent or minimize institutionalization; (2) a significant decrease

in institutionalized individuals occurred over a decade; (3) the State significantly increased community based spending, home and community based waiver slots over the course of a decade; (4) the State had a system of individualized community placement plans with extensive databases containing disabled citizens in the system. Id. at 1064-66. In Arc of Washington v. Braddock, 427 F.3d 615, 621 (9th Cir. 2005), the State's home care waiver program had increased home placements by more that 600 percent, the State doubled the budget for community-based programs, and had a 20 percent reduction in its institutionalized population. In Frederick L., the Third Circuit rejected Pennsylvania's deinstitutionalization plan for lack of time frames for patients' discharge from institutions, the lack of criteria of eligibility for discharge as well as the absence of defined arrangements with local authorities for housing, transportation, care and education to effectuate the disabled person's integration into the community. 422 F.3d at 160.

The Court first concludes that Tennessee Long Term Care Community Choices Act promotes the purposes of the ADA and RA. That Act states that "[t]he long-term care system shall promote independence, choice, dignity, and quality of life ... and shall include consumer-directed options that offer more choices regarding the kinds of long-term care services people need [and] shall offer services ... delaying or preventing the need for more expensive, institutional care." Long Term Care Community Choices Act of 2008, Publ. Chap. No. 1180, Senate Bill No. 4181, an Act to amend Tenn. Code Ann., Title 63, 68 and 71. Since Crabtree, the Defendants have implemented and CMS has approved CHOICES as a program for long-term medical services.

Yet, Plaintiff challenges Defendants' administration of the CHOICES program as

violating the ADA in that:

1.  Defendants do not allow any exceptions to CHOICE cost caps;

2.  Defendants deny enrollees the opportunity for individualized reasonable accommodations;

3.  Defendants' inflexibility compels institutionalization to receive necessary medical services;

4.  Defendants fail to provide a procedure which Plaintiff may obtain exceptions to cap and;

5.  Defendants impose cuts in services without regard to the enrollee's individual needs.

Plaintiff further asserts that for contracts for home health or community based services and nursing facility care, Defendants pay its MCOs a "per capita" fee based on the number of people in the Medicaid program, regardless of what services individual patients receive. Plaintiff alleges that TennCare also pays extra fees to the nursing facilities, because nursing facility care is paid on a fee for service basis. This is not a class action and the proof submitted here is insufficient to assess these systemic challenges to the Defendants' CHOICES program.

Yet, despite the laudable State Act on long term care and the initial implementation of CHOICES with references to transition of enrollees from nursing homes to community based medical service, the Defendants' financial expenditures for 2012 and projected 2013 for long term health care reflect that more than 90% of the Federal and State funds are expended on nursing homes. These facts here reveal improvement from the facts in Crabtree:

A comparison of the expenditures on the State's waiver plans from 2002 and 2007, based upon CMS data reveals the following:

|  | 2002 | 2007 |
|---|---|---|
| Aged/ Disabled | $6,102,958 | $16,051,823 |
| Developmentally Disabled | $261,603,425 | $588,568,195 |

| Nursing Homes | $936,533,890 | $1,182,654,826 |

> Plaintiffs' Exhibit No. 25. In a report issued in December, 2003, John Morgan, the State Treasurer issued a Report on "Serving the Aged and Disabled: Progress and Issues" and found among other things, that "[t]he state has not served any clients through the 1915(c) home and community-based services program, even though the Centers for Medicaid and Medicare (CMS) approved Tennessee's application in May 2002" (Plaintiffs' Exhibit No. 33, at p. I)

2008 WL 5330560 at *18.

To evaluate the facts here for the fundamental alteration defense, two Court of Appeals decisions are instructive. In <u>Fisher,</u> the state imposed a rule limiting Medicaid coverage of prescription drugs to only five prescriptions per month for individuals who were living in the community. 335 F.3d at 1178. If Medicaid beneficiaries required more than five prescriptions, they had to move into nursing homes, where prescriptions were covered without limits. <u>Id.</u> Plaintiffs requested an accommodation that would enable them to obtain prescriptions in excess of the five-prescription cap while still receiving the care in their homes. <u>Id.</u> The Tenth Circuit reversed a grant of summary judgment in defendants' favor and held that the cap on prescriptions could violate the ADA's integration mandate. <u>Id.</u> The Tenth Circuit rejected the district court's holding that fiscal burdens associated with reasonable accommodations would necessarily require a fundamental alteration, stating:

> [It is not] clear why the preservation of a program as it has existed for years . . . would fundamentally alter the nature of the program . . . Plaintiffs are simply asking that a service for which they would be eligible under an existing state program . . . be provided in a community-based setting rather than a nursing home. . . . Given that Oklahoma has, until recently, provided unlimited prescriptions to participants in the Advantage program, and continues to do so for those living in nursing homes, receiving medically necessary prescriptions is clearly in the nature of Oklahoma's HCBS program.

<u>Id.</u> at 1183.

With regard to financial burdens, the Tenth Circuit observed that "Congress was clearly aware that 'while the integration of people with disabilities will sometimes involve substantial short term burdens, financial and administrative, the long range effects will benefit society as a whole.'" Id. at 1183, quoting H.R. Rep. No. 101-485, pt. 3, at 50, reprinted in 1990 U.S.C.C.A.N. 445, 473. Moreover, the Tenth Circuit questioned whether the required accommodation would constitute a fiscal burden at all. In response to the lower court's suggestion that having to provide prescriptions in excess of the cap would force them to eliminate the home-based program altogether, the court observed that

> [g]iven that the cost of institutional care is nearly twice of community-based care, it seems unlikely that ... elimination of the waiver program, would have solved Oklahoma's fiscal crisis, because it could have served only to drive participants into nursing homes.

Id. at 1183.

In Radaszewski, the plaintiff had brain cancer and suffered a stroke at the age of 13 for which the plaintiff required twenty four hour care, with 16 hours per day of private duty nursing, to survive. 383 F.3d at 600-01. As here, when the plaintiff was under 21, his services were covered through a Medicaid program for children, but when he reached 21, the plaintiff was ineligible for continued coverage of those medical services under the state's program. Id. at 602. The State's community-based services for individuals over the age of 21 was capped at a funding level that would not provide 16 hours of nursing services and would have forced plaintiff to enter an institution to receive necessary care. Id. at 603. There, the plaintiff asserted claims for violations of the ADA and Section 504's integration mandate, but the district court granted the defendants' motion for judgment on the pleadings. The Seventh Circuit reversed and remanded for further findings, holding that "[t]he integration mandate may well require the state to make

33

reasonable modifications to the form of existing services in order to adapt them to community-integrated settings." Id. at 611.

On remand, the district court held that the state's failure to fund at-home, private duty nursing for the plaintiff was disability discrimination and ordered the state to pay for the sixteen hours of nursing services in his home. Radaszewslci v. Maram, No. 01-C9551, 2008 WL 2097382 (N.D. Ill. 2008) (Ex. A, hereto). Although the state's program for adults did not provide for coverage of these nursing services, the district court held that home and community-based services was a reasonable accommodation and rejected the state's fundamental alteration defense holding that the Plaintiff's nursing needs could be accommodated by approval of additional hours for nursing services, modifying or altering other Medicaid programs that covered nursing services, or pursuing amendments to the state's program g with the federal agency to promote community-based integration. Id. at *15. To be sure, the court also noted that the cost of providing care in "the proper institutional setting - a hospital - would be substantially greater than the cost of allowing (plaintiff] to remain in the community and receive the same proper treatment and community care." Id.

As stated in the Attorney General's policy statement on the ADA, a role assigned by Congress, to assert the fundamental alteration defense, "a public entity cannot rely on its Olmstead plan as part of its defense unless it can prove that its plan comprehensively and effectively addresses the needless segregation of the group at issue in the case". (Docket Entry No. 26-5 at 7) A public entity that cannot show it has and is implementing a working plan will not be able to prove that it is already making sufficient progress in complying with the integration mandate and that the requested relief would so disrupt the implementation of the plan

as to cause a fundamental alteration. See <u>Day v. District of Columbia</u>, 894 F. Supp.2d 1, 27 (D.C. 2012. ("A public entity cannot rely on its <u>Olmstead</u> plan as part of its defense unless it can prove that the plan comprehensively and effectively addresses the needless segregation of the group at issue in the case.").

Here, given the highly disproportionate share of Federal and State expenditures, 90% for nursing home care in contrast to 10% for community based home care, the Court cannot conclude at this time that the Defendants' have an effective <u>Olmstead</u> plan sufficient to bar Plaintiff's ADA and RA claims. Moreover, the very limited relief sought here does not implicate the fundamental alteration defense. As reflected in the Attorney General's statement on the ADA , "[p]roviding services beyond what a state currently provides under Medicaid may not cause a fundamental alternation." and provided the following example:

> For example, the fact that a state is permitted to "cap" the number of individuals it serves in a particular waiver program under the Medicaid Act does not exempt the state from serving additional people in the community to comply with the ADA or other laws, for example by seeking a modification of the waiver to remove the cap.

(Docket Entry No. 26-5 at 5).

Defendants contend that their MCOs can provide a reasonable modification of a home care plan, but only "so long as it is cost-effective." See Tenn. Comp. R. & Regs. 1200-13-13-.01(29), 1200-13-13-.04(1)(d) and 1200-13-13-.04(2). Defendants also cite the option for Plaintiff to "self-direct certain health care tasks that would otherwise have to be performed by a licensed or registered nurse", as an accommodation. (Docket Entry No. 17, Killingsworth Declaration at 21). Again, this "accommodation" is for any individual participating in the CHOICES program. <u>Id.</u> With the stated limitation of cost effectiveness within the cost

cap, the Court does not deem this option to be an accommodation within the meaning of the

ADA, See Day v. District of Columbia, 894 F. Supp.2d at 26, ("an Olmstead Plan should do

more than provide vague assurances of future integrated options or describe the entity's general

history of increased funding for community services and decreased institutional populations.

Instead, it must reflect an analysis of the extent to which the public entity is providing services in

the most integrated setting and must contain concrete and reliable commitments to expand

integrated opportunities.") (citing DOJ Statement at 6). According to the Attorney General 's

statement on accommodations: "Remedies should [ ] focus on expanding the services and

supports necessary for individuals' successful community tenure." (Docket Entry No. 26-5 at 8).

The Defendants' proffered options do not extend to providing the necessary relief.

For these collective reasons, the Court concludes that Plaintiff's motion for a preliminary

injunction should be granted as to his proposed plan for his home care needs that are consistent

with the provisions for similarly situated enrollees in the Defendants' CHOICES program. (See

Docket Entry No. 37). Plaintiff's proposed plan shall be implemented consistent with the

CHOICES's procedures.

An appropriate Order is filed herewith.

Entered this the _15_ day of August, 2013.

William J. Haynes, Jr.
Chief Judge
United States District Court